IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JAMESETTA F.,**[1] <br><br> **Plaintiff,** <br><br> v. <br><br> **COMMISSIONER OF SOCIAL SECURITY,** <br><br> **Defendant.** | Case No. 3:22-CV-831-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In accordance with 42 U.S.C. §405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## BACKGROUND

Plaintiff applied for DIB alleging an onset date of January 31, 2017. (Tr. 12). Plaintiff's claim was initially denied on October 12, 2017, and upon reconsideration on April 12, 2018 (Tr. 78-91). On May 21, 2018, Plaintiff filed a request for a hearing by an Administrative Law Judge (ALJ). (Tr. 119). After holding an evidentiary hearing, an ALJ denied the application on November 18, 2021. (Tr. 20). The Appeals Council denied Plaintiff's request for review on March 16, 2022, making the ALJ's decision the final

---

[1] Plaintiff's full name will not be used due to privacy concerns. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

agency decision subject to judicial review. (Tr. 26-30). Accordingly, Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## ISSUE RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1. The ALJ failed to properly evaluate residual functional capacity (RFC).

2. The ALJ failed to properly evaluate credibility.

(Doc. 13, p. 4).

## LEGAL STANDARD

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently employed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. A negative answer at any step, other than at step three precludes a

finding of disability. The claimant bears the burden of proof at steps one through four. Once the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**EVIDENTIARY RECORD**

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

I.     **Evidentiary Hearing**

Plaintiff was represented at the evidentiary hearing on May 4, 2020. (Tr. 32). The ALJ began by examining Dr. Jeffrey Horwitz, M.D. ("Dr. Horwitz"). (Tr. 35). Dr. Horwitz is board certified in ophthalmology. Dr. Horwitz never examined or treated Plaintiff. Instead, Dr. Horwitz reviewed Exhibits 1F through 13F in Plaintiff's medical file. Dr. Horwitz had some questions for Plaintiff. (Tr. 36). During his questioning, Plaintiff explained that she last had a botulinum injection in 2016 or 2017. (*Id.*). Plaintiff also is using the ptosis crutch on her glasses, but it is not doing anything for the blepharospasm. [2] (Tr. 38). The ptosis crutch helps her with driving, and Plaintiff can drive longer than ten minutes. (Tr. 39). As far as the blepharospasm episodes, Plaintiff said they

---

[2] The Court understand ptosis is "a drooping eyelid." *Hammerslough v. Berryhill*, 758 F. App'x 534, 536 (7th Cir. 2019). "A ptosis crutch is a device intended to be mounted on the spectacles of a patient who has ptosis (drooping of the upper eyelid as a result of faulty development or paralysis) to hold the upper eyelid open." 21 C.F.R. § 886.5600.

"Blepharospasm is a type of muscle contraction in which the eyelids are repeatedly and involuntarily forced shut." *Albright v. Apfel*, 1999 WL 1129102, at *2 (N.D. Ill. Dec. 7, 1999) (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1089, 2 (28th ed.1994)). "A blepharospasm is defined as 'a chronic, unremitting, bilateral, variably progressive dysfunction of the nerve that controls the muscles around the eye.'" *Id*. "It manifests itself as an uncontrollable, forcible closure of the eyelids." *Id*. "It often affects both at once, but it can also affect only one eye." *Id*. "In some cases, other muscles in the face can twitch as well, especially around the cheek and brow." *Id*. "Severe blepharospasm can cause the eyelids to be forcibly closed for a duration longer than the typical blink reflex, causing a variable interruption in the ability to see." *Id*; *see also Smith v. Berryhill*, 2018 WL 4679584, at *1 (N.D. Ill. Sept. 28, 2018) (noting blepharospasm is a "neurologic disorder characterized by excessive blinking and forced involuntary closure of the eyelids").

vary from day-to-day. (Tr. 39-40). Sometimes they may last one minute, or they may last hours. (Tr. 40). Sometimes she has multiple episodes in one day. (*Id.*).

The ALJ then asked Dr. Horwitz about Plaintiff's medically determinable impairments. (Tr. 41). Dr. Horwitz explained that her main diagnosis is benign essential blepharospasm. (*Id.*). Next, Dr. Horwitz explained that Plaintiff also has ptosis. (Tr. 42). Then the ALJ asked about Dr. Horwitz's opinion as to whether or not Plaintiff's impairments individually or in combination met or equaled any of the listings of the Commissioner. (Tr. 44). Dr. Horwitz explained that he did not think that her impairments met or equaled any of the listings. (Tr. 45-46). Dr. Horwitz continued testifying that Plaintiff "should not be at unprotected heights, she shouldn't climb ladders or scaffolds, she shouldn't do commercial driving, she should not be around moving machinery and since you never know when her eyelids are going to be shut then that would, those would be limitations, actually complete limitations for her." (Tr. 46). Dr. Horwitz also added "[y]ou know, even though—and this is for you to decide of course, the, I guess it's for the vocational expert to decide that even if she doesn't meet or equal the listing if someone with these intermittent problems, never knows when her eyelids are going to close, how long it's going to last and all that, *whether there are indeed jobs that she can do and that's I certainly think that she might have a lot of difficulty in a lot of different areas*." (Tr. 50) (emphasis added). Dr. Horwitz could not state a percentage of the day that Plaintiff would be unable to use her eyes or be off task because he is not "able to say with any certainty exactly how long her eyes stay closed or how frequently during the day but it appears to be that greater than 50% of the time she's able to keep them open and that for relatively short

periods of time, although she testified sometimes it's for hours, but that wasn't along with that, blepharospasm." (Tr. 54).

A vocational expert ("VE") also testified at the hearing. The ALJ asked him a hypothetical question that corresponded to the RFC assessment—whether there would work for an individual with no exertional limitations, with the same age, education, and work experience as Plaintiff. (Tr. 66). The VE testified that there are approximately 25,000 medium packer jobs nationally, approximately 10,000 medium crate liner jobs nationally, and 50,000 medium laundry worker jobs nationally. (Tr. 67-68). The ALJ also asked the VE about the tolerance for time off task in unskilled work. (Tr. 68). The VE answered "[s]omewhere between nine and 10% of the complete day beyond regular breaks." (*Id.*). As far as tolerance for absences, the VE noted "[u]nexcused would be three to five days a year, excused could be to one day a month, but that's up to the employer." (*Id.*).

## II.    Relevant Medical Records

In June 2016, Plaintiff reported that she was having blepharospasms daily and "[c]onstantly feels like she is fighting to keep her eyes open." (Tr. 296). Plaintiff received treatment in the form of Botox injections in both eyes at Quantum Vision Centers. (*Id*). A couple months later, Plaintiff noted that "in the past 6 weeks she is still having spasms in both eyes. Maybe even more often. She thinks the Botox last time didn't help as much as it has in the past." (Tr. 302). Michael Jones, M.D. ("Dr. Jones") confirmed that Botox injections were "clearly not enough to control the blepharospasm." (*Id.*).

In April 2017, Plaintiff was evaluated by Kevin Wright, M.D. ("Dr. Wright"). (Tr. 327). Plaintiff reported that her last Botox injections "caused itching and bumps

inside and out the lids." (*Id*.). She also was unsure if the injections helped. Dr. Wright observed that Plaintiff's blepharospasm was "moderate." (*Id*.). Plaintiff reported that she can see pretty good when she forces her eyes open. (*Id*.).

In May 2017, Plaintiff was examined by Wen Chen, M.D. ("Dr. Chen"). (Tr. 334). Dr. Chen observed "significant blepharospasm in both eyes." (Tr. 335). Dr. Chen continued reporting that "[Plaintiff] definitely has some degree of difficulty with her daily activity due to significant blepharospasm." (*Id*.). The adjudicator then asked Dr. Chen to clarify his answers to several questions regarding his examination. Dr. Chen clarified that claimant was constantly blinking. (Tr. 337-339).

In September 2017, Plaintiff was seen by Geoffrey Hill, M.D. ("Dr. Hill"). (Tr. 345). Plaintiff reported that her blepharospasms have "gradually gotten worse." (*Id*.). Plaintiff explained her vision is "ok" with glasses and when she does not have spasms. (*Id*.). Plaintiff had intermittent eye pain with headaches and wears tinted eyeglasses at all times. (*Id*.). Later in September, Plaintiff had an optometric examination performed by Nathan Noakes, O.D. (Tr. 347). Plaintiff reported that her eyelids close and will reopen after different periods of time. (*Id*.).

In September 2018, Christina Levi from Crown Vision Center attempted to examine Plaintiff, but was unable to observe intra ocular tensions even after holding her eyelids. (Tr. 360). Also, Levi was only able to perform a "very quick view" of C/D ratio observation because Plaintiff's eye kept closing. (*Id*.).

In April 2019, Plaintiff was evaluated by Alexander Barsam, M.D. ("Dr. Barsam"). (Tr. 364). Plaintiff reported that she has to hold her eyes open some days and "[f]eels she

is fighting all day to keep eyes open." (*Id.*). Plaintiff also stated that "she can no longer read for a long period of time and has trouble driving, which is why her sister brought her to her appointment today." (*Id.*). Her blepharospasms were rated the most severe on the Jankovic scale (Tr. 44-45; 365). At the same time, the frequency of her blepharospasms were rated a two out of four on the Jankovic scale. (Tr. 45; 365). Dr. Barsam noted Plaintiff had a significant functional impairment because of the blepharospasm. (Tr. 366). Gabriela Espinoza, M.D., "examined the [Plaintiff] with the resident and [ ] agree[d] with the findings and plan of care as documented by the resident." (Tr. 367).

### III. State Agency Consultants' Opinions

In November 2017, Julio Pardo, M.D. ("Pardo") assessed Plaintiff's RFC based on a review of the record. (Tr. 71-79). Pardo indicated that Plaintiff was limited in both eyes due to "significant blepharospasms." (Tr. 76). In April 2018, Lenore Gonzalez, M.D. ("Gonzalez"), the second state agency consultant, agreed with Pardo's opinion. (Tr. 81-91). Gonzalez noted that Plaintiff "[r]eports no worsening, no new impairments, list one new Chiropractic source which she was need in 9/2017, last decision was made on 10/12/17 . . . [n]o new evidence to add to assessment." (Tr. 86).

### DECISION OF THE ALJ

The ALJ followed a five-step sequential evaluation process for determining whether Plaintiff is disabled. She determined if the claimant has not engaged in substantial gainful activity since the alleged onset date. (Tr. 15). The ALJ found that Plaintiff has the following severe impairments: ptosis of the eye and blepharospasms. (*Id.*).

The ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments within the meaning of the Social Security Act. (*Id.*). Thus, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations:

- can never climb ladders, ropes, or scaffolds;

- no exposure to hazards such as unprotected or unprotected moving mechanical parts;

- not engage in any commercial driving;

- not work in an environment with bright lights such as sunlight and should be allowed to be allowed to wear sunglasses indoors;

- not work in an environment with very low humidity such as that in a desert setting.

(Tr. 15-16). The ALJ found that Plaintiff was capable of performing her past relevant work as a Sales Clerk. (Tr. 19). The ALJ also found that Plaintiff was "able to perform the work as generally performed, per the vocational expert's testimony." (Tr. 19).

## DISCUSSION

Plaintiff argues "[t]he ALJ failed to recognize that her qualifying statements, that Plaintiff can function **when** she can wear her crutched eyewear and she has normal acuity **when** she is able to keep her eyes open, define the issue." (Doc. 13, p. 8). Plaintiff's argument follows that "[t]he ALJ failed to evaluate whether Plaintiff can wear her crutched eyewear or keep her eyes open eight (8) hours per day, five (5) days per week, as required by Social Security law." (*Id.*). Thus, Plaintiff contends that "[t]he ALJ failed to

build an accurate and logical bridge between the evidence, that Plaintiff cannot wear her crutched eyewear or keep her eyes open forty (40) hours per week, and the conclusion that Plaintiff can sustain full-time employment." (*Id.*).

The Court agrees. The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, [however] the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Here, the ALJ ignored evidence that corroborates Plaintiff's subjective allegations with the physical examination findings. For instance, the ALJ noted that "records prior to the date last insured generally document intact visual acuity, full fields of view, and generally intact ability to maintain normal vision patterns despite rapid blinking and suggestions of visual fatigue when using devices such as crutched eyewear." (Tr. 17). The ALJ supports this assertion by pointing to Dr. Chen's "supplementary statement to clarify that [Plaintiff] did not need to hold her eyes open during testing and that her frequent blinking would not affect her visual acuity." (*Id.*). Also, the ALJ points to evaluations in September 2017 noting, "[t]here were no indications of spasm during these evaluations and examination of the structure of the eye continued to note no deficits . . . ." (*Id.*).

When the ALJ could no longer ignore evidence corroborating Plaintiff's subjective allegations, the ALJ took issue with Plaintiff's lack of treatment:

> More recent evaluations in 2018 and 2019 suggest gradual worsening of her condition, including reports of difficulty reading and no longer feeling comfortable driving due to frequent blinking or trouble keeping her eyes open, yet I note that the claimant has not engaged in any substantive treatment, therapy or interventions beyond routine eye exams and

consultative examinations for the purpose seeking disability benefits. As part of the April 2019 evaluation, she was provided with several options to manage and improve her condition, including use of a different chemical compound to treat muscular spasm of the eyelid, surgical intervention to weaken the muscle of the eyelid and allow easier opening and closing, or *crutched eyewear to keep the eye open*. (9F/2, 4; 10F; 11F).

(Tr. 18) (emphasis added). Not only does Plaintiff wear crutched eyewear, but also clinicians regularly documented Plaintiff's inability to keep her eyes open during their physical examinations. (Tr. 302, 335, 360, 365, 366, 337). Accordingly, the Court finds that the ALJ failed to build the required "logical bridge" from the evidence to the conclusion that Plaintiff can sustain full-time employment.

## CONCLUSION

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:  June 30, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**